## ELIHU ROGERS

*v.*

## TRUSTEES OF SCHOOLS OF TOWNSHIP 23  N. R. 4 E.

1. RELEASE OR SURETY—*by the destruction of collateral securities.* Where the holder of a note, with personal security, at the time of its execution, receives other security therefor, as a mortgage on real estate, a destruction of such collateral security by the payee of the note, without consent of the sureties, will operate to release such sureties.

2. And, if a note so secured, is renewed with personal security, a part of the sureties upon the new note being the same as upon the original note, and a part not the same, the mortgage, which is incident to the old debt, will follow it, and the destruction of such collateral security subsequent to the execution of the new note will operate to release the sureties upon the new note.

3. PROMISSORY NOTE—*when joint and several, of the relation of the makers as sureties.* Where a joint and several note is executed by the party in interest as principal with one or more, not in interest as sureties, and their character as sureties being so understood by the payee of the note, it is competent for them, even in an action at law, to prove their character as sureties by extrinsic evidence. This rule applies as well, where a note was under seal, as where it was not.

4. So, where the makers of the new note are so released by the subsequent destruction of the collateral security, they may make their defense available in an action at law upon the note.

APPEAL from the Circuit Court of McLean County; the Hon. JOHN M. SCOTT, Judge, presiding.

The opinion fully states the case.

Messrs. WILLIAMS & BURR, for the appellant.

Messrs. BRIER & BURCH, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was an action of debt, brought by the Trustees of Schools of Township 23, North of Range 4, East, in the Mc-Lean Circuit Court, against John J. Price, George W. Stipp and Elihu Rogers, on a note under seal. Price was defaulted, but Rogers and Stipp filed separate pleas; and there was an agreement by counsel in the case, that all matters that might be specially pleaded, could be given in evidence under the general issue. A trial was had by the court, resulting in a judgment in favor of the plaintiffs for $958 debt, and $478 damages, from which an appeal was prayed by Rogers and Stipp, but the former alone perfected his appeal, and brings the case to this court.

It appears from the record, that the school commissioner sold to Price the N. E. 16, 23 N 4 E, on the first of October, 1851, for the sum of $478.09, and took his note for that amount for the purchase money, payable five years after date, with Rogers, Stipp and Glimpsie, as securities. He, at the same time, took of Price a mortgage on the premises to secure the payment of the note. On the same day, Stipp also purchased the S. E. quarter of the same section, from the school commissioner, for $479.19, for which he gave his note, with Price, Rogers and Glimpsie as securities, and gave a mortgage on the land to secure its payment. Afterwards, the school commissioner turned over the notes to the appellees, and they held them as a part of the school fund of the township.

Before the maturity of the notes, Price bought Stipp's quarter, for about $4,000, and as a part of the consideration, agreed

to pay Stipp's note, given to the school commissioner, and gave his notes for the remainder. To secure these notes, he executed a mortgage on the premises. About this time, the notes to the school commissioner fell due, and the treasurer of the township applied to Price and Stipp to renew the notes, and Price gave his note for both of the previous notes, and Rogers and Stipp became·sureties, and the old notes were given up and canceled.

The treasurer still held the mortgages given to the school commissioner by Price and Stipp. On the second day of January, 1857, Price executed a mortgage to one Folsom, on the N. E. qr. 16, 23 N. 4 E., to secure a note of $1,180, given by him to Folsom, due in one year, which was duly recorded the day after it was executed.

On the eighth of October, 1858, appellees applied to Price to give them a new mortgage, to secure the note which he executed, on the same quarter section he had mortgaged to Folsom. Appellees accepted this mortgage and canceled both of the first mortgages, and had this mortgage recorded. On the fifth of December, 1861, Nichols, the assignee of the $5,600 mortgage, given by Price to Stipp, filed his bill to foreclose. A decree was rendered for $5,000, declaring that the mortgage was the first incumbrance on the land. Under this decree, the land was sold to Nichols, for $3,200, and not being redeemed, he received a deed. On the 23rd day of August, 1861, Folsom filed a bill to foreclose his mortgage on the Price quarter. Appellees were made parties, and were defaulted,·and a decree of foreclosure was rendered for the amount of the mortgage, which was. declared to be a first lien on the land. This land was sold to complainant under the decree for $1,229.92, and not having been redeemed within twelve months, Nichols, as a judgment creditor, redeemed and became the purchaser, and afterwards received a deed.

It appears that at the time the mortgages were foreclosed, the lands were worth twenty dollars an acre, and Nichols testified

that he has since sold them, each quarter for $4,000, to innocent purchasers, without notice of the equities of the parties; and that Price has been for years wholly insolvent.

About the evidence, there seems to be but little difference as to what it proves, but the question in controversy is, whether the release of the prior mortgages, after the execution of the new note, was such an act as would release the securities to the new note; and, if so, whether, as the note is joint and several, without in any manner disclosing the fact that any of the makers are securities, that fact may be shown by extrinsic evidence. In all proceedings between themselves, the makers may show their relations to the transaction, by evidence outside of the note or obligation. And, while there is some diversity in the decisions of the various courts, as to whether, in a suit at law by the payee against the makers, they may aver and prove that a portion of them are merely securities, and that they have been released, as such, by the acts of the payee. But the rule is settled in this court, that the defense may be made at law, as well as in equity. *Flynn* v. *Mudd and Hughes*, 27 Ill, 328; *Drew* v. *Drury*, 31 Ill, 250; *Kennedy* v. *Evans*, ib. 258.

It is, however, urged, that there is a distinction between a note under seal and an unsealed instrument. That the law has made a distinction in a class of cases, for some purposes, is unquestionably true. It has declared that some instruments, if not under seal, shall be inoperative to accomplish the purpose for which they are executed. It is so of a deed for the conveyance of real estate, a bill of exceptions, and some other instruments; but the reason of such a requirement has long since ceased, and it is now only necessary because of the imperative demands of the law. Our statute making notes assignable, whether under seal or not, has, to that extent and for that purpose, abolished all distinction between the two classes of paper. The one is negotiable as well as the other, and the same incidents attach to one class as the other. This

statute abolishes many of the common law distinctions which affected *choses in action.* At common law, these instruments were not assignable so as to pass the legal title to the instrument; but this statute authorizes it to be done precisely as by the endorsement of a bill of exchange. It also permits the common law presumption of a consideration for the instrument which a seal creates, to be rebutted and overcome by averment and proof; and we are at a loss to perceive why the presumption that all the makers are principals, may not be overcome in the same manner. The statute has permitted an averment against the legal implication created by the use of a seal, and no valid reason has been urged, and none occurs to us, why the other inference, that all of the makers, in the absence of a statement in the instrument that they are not, may not be, overcome in the same manner and to an equal extent, where the note is under seal, as where it is unsealed. The same reasons seem to apply with equal force.

We now come to the consideration of the other and more important question, which involves the merits of the controversy. The doctrine is well and almost uniformly established, that, in equity, the mere change of the form of the debt does not, as between the parties to the transaction, change the security ; that the mortgage is the incident, and follows the debt in its various changes, whether by renewal, judgment or otherwise. When the new note, therefore, was executed in this case, unless there had been an agreement to that effect, it did not change the lien of the debt upon the land, created by the mortgages, especially when no further security was taken. The parties to this note were the same persons who had executed the original notes, except Glimpsie. So far, then, from taking further security, a portion of that already held was discharged. Even then, if taking further security could have operated to discharge the mortgages, that cannot be insisted upon in this case. The new note was given to the creditor in

the first notes, and there was, in that respect, no substantial change in the transaction.

These mortgages were a continuing security for the purchase money, were on record, and notice to the world, until they were subsequently satisfied by the creditor, without the assent of the sureties. Any person dealing with the land, and seeing these mortgages, would have been led to make inquiries whether they had been discharged by payment or extinguishment of the debts; and upon such inquiry of the persons to whom they pointed for information, they would have learned the true situation of the transaction. It appears that the lands embraced in the mortgages were amply sufficient in value to have more than discharged the indebtedness. They were also the first and superior liens on the land, the subsequent creditors having procured their mortgages subject to this incumbrance. It also appears that Price, the principal in the new note, had become insolvent, and the debt, if paid, would have to be by the other parties to the note. That appellant is, therefore, injured, there can seem to be no doubt.

Had there been no release of these mortgages, the sureties, upon paying voluntarily, or being compelled to pay the debt, would have been subrogated to the rights of the creditor, and could have enforced the lien in equity, and had the money, thus paid, refunded to them. But by their satisfaction and the release of the lien, other innocent parties have acquired rights that operate to cut off their remedy against the land; and to this the sureties never gave their assent, nor do we see that they have ever ratified the action of the township treasurer. In this they have been deprived of important rights.

But may this defense be interposed in an action at law? We have repeatedly held, that a release of the principal, by a valid agreement for the extension of time for payment, without the consent of the surety, operates as a discharge, and he may avail of the defense in an action at law. This defense depends upon different principles, as in this class of cases the

55—46th Ill.

original contract is not changed in terms between any of the parties, but a collateral indemnity, held in trust by the creditor, and upon which the surety has a right to rely, has been destroyed, and he is presumed to have suffered loss by the surrender of the security. The creditor, having misapplied the trust fund, and acted in bad faith towards the surety, must be held to have released the surety, in equity, or, rather, to be estopped from looking to him for payment, by reason of his bad faith in discharging his duty to the trust fund held for their common security.

It is certainly true, that where a pledge of real or personal property has been given by the principal debtor, to secure the debt, such securities enter into and form part of the elements of the transaction, and must be presumed to have operated as an inducement to the surety to incur his liability. Such securities are regarded by him as a means of safety, and according to the usual course of business, he is entitled to rely upon them, as an indemnity against ultimate loss. And for the same reason, that a creditor may not prevent the surety from resorting to recourse upon his principal, he cannot prevent him from protecting himself against ultimate loss by looking to the securities which have been pledged for the payment of the debt. The surety has as ample a right to avail himself of the indemnity such securities afford, as he has to resort to his principal. And any distruction of such collateral securities by the creditor, must be held as releasing a surety, at least to the extent of their value. *Copel* v. *Butler*, 2. Simons 457; *Hayes* v. *Ward*, 4 John. Ch. R. 123. This seems to be the uniform rule in equity.

Under the more stringent and technical rules of the ancient common law, it was held, that relief could only be had in equity to discharge a surety. But under the tendency of modern decisions, substance is more regarded than mere form, and the doctrine seems now to be recognized, that whatever discharges a security in equity, may be interposed in a suit at

law, unless there be such a complication of interests as would prevent a court from affording adequate relief. And although relief may be had in both courts, the chancelor will not send a case to a court of law to seek his defense. *Samuel* v. *Howarth*, 2 Mer. 287; *Mayhew* v. *Circkett*, 2 Swanst. 185; *Hawkshaw* v. *Parkins*, ib. 539; *Eyre* v. *Everett*, 2 Russ. 382; *Mackintosh* v. *Wyatt*, 3 Hare 567; *Moore* v. *Bowmaker*, 6 Taunt. 379; *Mellville* v. *Glendenning*, 7 Taunt. 126; *Philpot* v. *Briant*, 4 Bing. 717. And we can see no reason why a court of law is not as competent to try the defense, as that of equity, and no practical benefit is perceived in compelling the security to resort to the more tedious and expensive mode of trial to obtain a discharge. We are therefore inclined to follow these authorities, and permit this defense to be made. We are therefore of the opinion that appellant has established a complete defense, on his part, to the note, and that the court below erred in rendering judgment against him. The judgment of the court below is reversed and the cause remanded.

*Judgment reversed.*