NATHANIEL K. FAIRBANK, EXr.

*v.*

THE MERCHANTS' NATIONAL BANK OF CHICAGO.

*Filed at Ottawa October 31, 1889.*

1. SECURITY—*pledge—change of form of indebtedness—renewals—
effect upon the security, as a continuing security.* The general rule is,.
that the mere change of the form of the indebtedness does not release
the security given therefor, unless such was the intention of the parties.
A renewal of the note evidencing the indebtedness, its merger in a
judgment, or other change, not intended to operate 'as a discharge of
the lien, still leaves it, as between the parties, in full vigor.

2. SAME—*re-pledge of security—upon renewal—whether a release of
pledge.* A person pledged to a bank one hundred shares of railway
stock belonging to his wife, to secure his notes, and a note of himself.
and a partner. As these notes matured, new ones were executed and
the interest paid in advance. This was continued for about four years,
when the husband, instead of paying interest in advance, made to the
bank a new note, payable in ninety days, for the amount of the last
preceding note, and interest on the new note to its maturity, and the
old note was given up to the maker, and entries were made in the bank
books, showing a credit of the amount of the old note paid, and a debit
for the amount due on account of the new note, and indicating the
balance due. The new note recited the deposit, of that date, of one-
hundred shares of stock, etc., as collateral security for this, and another
note from the same maker and his partner : *Held,* that the mere renew-
als of the notes could not have had the effect of releasing the original
pledge of the stock.

3. SAME—*whether a new pledge—or a continuation of the former one.*
In the same transaction, not only was the prior note given up to the
maker, but the written contract of pledge which accompanied it was
surrendered to him. He then re-pledged the stock to the bank to-
secure a new loan, and the wife's right to certain dividends upon her
stock depended on the fact whether this transaction was a new pledge-
of her stock, or but a continuation of the former one : *Held,* that such
surrender of the old note, and the pledge securing the same, afforded·
*prima facie* evidence that the old note was paid and the collateral se-
curity therefor released.

4. Had the former contract of pledge been retained when the old
note was given up, the presumption would be that the original security
was not released, but remained in full vigor for the security of the new
note.

5. But it being a question of intention, the fact that the old contract of security, as well as the old evidence of indebtedness, was returned to the maker or debtor, and a new contract of pledge, with a new power of sale, as well as new note, substituted therefor, adds to the force of the circumstance of surrender and discharge.

6. SAME—*pledge of stocks — dividends — how applied.* A pledge of railway stocks to secure the payment of money, will not entitle the pledgee to recover any dividends declared on such stock prior to the pledge, but the pledgee will be entitled to collect subsequent dividends.

7. PAYMENT—*giving a new bill or note—parol evidence.* It is competent for the parties to show that a bill or note given, was, by express agreement, received in absolute payment and discharge of the precedent debt, or the contrary. It may also be shown that there are facts and circumstances attendant upon the transaction from which an understanding and agreement may be inferred. The intention governs, when it can be ascertained.

8. PAROL EVIDENCE—*to contradict a contract of pledge.* Parol evidence is not admissible to contradict a contract of pledge, such as a statement in a promissory note that certain stock had been transferred as collateral security.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. LORIN C. COLLINS, Judge, presiding.

The Merchants' National Bank of Chicago, appellee herein, exhibited its bill in chancery in the circuit court of Cook county, against Sarah L. Peck, appellant's testate, to recover from her certain dividends on one hundred shares of the capital stock of the Chicago City Railway Company received by her, and ninety-nine additional shares of stock in said company subscribed for and issued to her as the holder of the said one hundred shares, under certain resolutions of the company increasing its capital stock. The claim of the bill was, that appellee was entitled, as pledgee, to such dividends and such additional stock as part of its security for an indebtedness evidenced by a judgment rendered on a note dated May 14, 1883, of John L. Peck, husband of said Sarah L. Peck, and for a further indebtedness evidenced by a judgment rendered on two notes, dated May 12 and May 17, 1883, respect-

ively, of the firm of Peck & Bausher, of which said John L. Peck was a member.

The answer of Sarah L. Peck admitted the recovery of the said several judgments, and the receipt by her of the dividends and additional stock, but denied the right of appellee to either said dividends or said additional stock, and claimed that she, said Sarah L. Peck, was entitled, in her own right, to the same, as the equitable owner of the one hundred shares of stock. Prior to the hearing, the death of Sarah L. Peck was suggested, and Nathaniel K. Fairbank, her executor, appellant herein, was substituted as defendant, and he made answer adopting the answer of his testate, theretofore filed.

There were replications to the answers, and a hearing was had upon the pleadings and proofs. A final decree was entered by the circuit court, finding the material allegations of appellee's bill of complaint to be true, and that there was due it, as principal and interest, upon the John L. Peck indebtedness, the sum of $3436.69, and due it, as principal and interest, upon the Peck & Bausher indebtedness, the sum of $10,421.32, making $13,858.01 in all, and that, as the pledgee of the one hundred shares of capital stock of the railway company, appellee was the equitable owner thereof, and entitled to receive the dividends declared thereon and the additional stock issued to the holder thereof, and decreeing that appellant, as executor, account to appellee for $12,303, for dividends received by his testate upon the one hundred shares of stock, first deducting therefrom $9950, being the amount paid at par by his testate for the new and additional stock issued to her, and pay over to appellee, in due course of administration, the residue of $2358, to apply upon the indebtedness found by the decree; and further, that appellant, as executor, assign and transfer to appellee ninety-nine shares of the capital stock of the Chicago City Railway Company, and deliver to it the certificate or certificates therefor, to be held by it, as pledgee, as collateral security for the unpaid balance due to it upon the

obligations of John L. Peck and Peck & Bausher. This decree was affirmed by the Appellate Court for the First District; and the present appeal is for the purpose of reviewing the judgment of affirmance entered in the Appellate Court.

In August, 1880, John L. Peck borrowed from the bank $18,000, and gave his promissory note therefor, and afterward borrowed additional sums of money from the bank, as follows: In October, 1880, $2000; in November, 1881, $5000; in April, 1882, $1500—making the total amount borrowed by him from the bank, $26,500. These various loans, as they were made, were incorporated with the antecedent indebtedness, and increased the principal of the new notes that were from time to time given. When the first mentioned note matured, a new note was executed, and the interest paid in advance, and entries made upon the books of the bank, showing a credit by payment of the old note, and debit on account of the new. There was a series of similar transactions down to May 14, 1883. At the time of the original loan, in August, 1880, one hundred shares of the capital stock of the Chicago City Railway Company, evidenced by two certificates for fifty shares each, issued to Sarah L. Peck, and indorsed by her in blank, were delivered by John L. Peck to the bank, in pledge, as collateral security for the indebtedness, but no transfer of said shares of stock was made upon the books of the railway company, or any new certificates of stock issued therefor, until on or about June 19, 1883. At each time a new note was executed and the old note surrendered, there was a re-pledge of the one hundred shares of stock, and a new contract of pledge made, and power of sale given similar to that contained in the note and contract of May 14, 1883, hereinafter set forth. The certificates for said shares of stock, however, remained continuously in the possession and under the control of appellee from the time they were first deposited with it, in 1880.

In March, 1882, the bank loaned to the firm of Peck & Bausher the sum of $15,600, and afterward loaned the firm

other moneys, so that on August 8, 1882, the firm indebtedness to the bank amounted to $33,600. This latter indebtedness was secured by the deposit of warehouse receipts for lard and stearine, and also, as appears from a sentence incorporated in the individual notes of John L. Peck, and from other testimony, by a pledge of the one hundred shares of railway stock. Certain payments were made upon this firm debt, and before May, 1883, it was reduced to $12,900, and the last notes of Peck & Bausher, which were given to the bank, were those of May 12, 1883, for $3000, and May 17, 1883, for $9900. In the meanwhile, there had been transactions between the firm and the bank on the maturity of the notes given, similar to those between John L. Peck and the bank, with surrender of the old notes, and entries of credit by payment of the old notes and debit on account of the new notes.

The individual note of John L. Peck to the bank, dated February 10, 1883, for $26,500, fell due May 14, 1883. Said Peck, instead of paying interest in advance, as theretofore, made to the bank a new note, dated May 14, 1883, and payable in ninety days, for the amount of the previous note and interest on the new note to the date of its maturity, i. e., for $26,979.21. At that time, the note of February 10, for $26,500, was surrendered to Peck, and entries made in the books of the bank as follows: A credit entry of $26,500, as payment of the note of February 10; a debit entry of $26,971.21, as the amount due on account of the note of May 14; and an entry of $26,979.21, as the balance due. The new note given and the power of sale were as follows:

"$26,979.21. CHICAGO, *May 14, 1883.*

"Ninety (90) days after date, I promise to pay to the Merchants' National Bank of Chicago, or order, at its office, twenty-six thousand nine hundred and seventy-nine and twenty-one hundredths dollars, for value received, with interest at the rate of seven per cent per annum after date, having deposited with said bank, as collateral security, certificate for

one hundred shares of stock of Chicago City Railway Company. This stock is also held as collateral security for note of Peck & Bausher.

JOHN L. PECK.

"I hereby give the said bank authority to sell the above described securities, or any part thereof, on the maturity of this note, or at any time thereafter, or before, in the event of said securities depreciating in value, at public or private sale, at their discretion, without advertising the same or giving me any notice, and to apply so much of the proceeds thereof to the payment of this note as may be necessary to pay the same, with all interest due thereon, and also to the payment of all expenses attending the sale of the said stock; and in case the proceeds of the sale of said stock shall not cover the principal, interest and expenses, I promise to pay the deficiency forthwith, after such sale.

JOHN L. PECK."

On June 19, 1883, the bank caused the one hundred shares of stock in the Chicago City Railway Company to be transferred on the books of that company, and new certificates of stock to be issued to C. J. Blair, vice-president of the bank, and after the maturity of the note of May 14, 1883, collected four dividends declared on said stock, amounting to $1200. On July 12, 1884, it sold said shares, under the power contained in the note and instrument of May 14, 1883, and the net proceeds of the sale were $24,687.40. One of the Peck & Bausher notes has a credit of $3854.84, net proceeds of one hundred and sixty-five tierces stearine.

On May 24, 1882, and while appellee held the one hundred shares of stock in the railway company as pledgee, the stock of that company was increased from $1,500,000 to $2,500,000, and the right to subscribe for and take at par the new stock thus created, pertained to each person being a shareholder on June 20, 1882, in proportion to the number of shares held by such person at that date. On June 20,—the day said right accrued,—the old stock was worth $335 per share, and on the day

thereafter it was worth only $225 per share. On April 10, 1883, and while appellee still held the stock as pledgee, the capital stock of the railway company was again increased from $2,500,000 to $3,000,000, to be taken at par by shareholders owning stock on April 20, 1883, in proportion to their shares. On April 17 the stock of the company was rated at $270 per share, and May 11, following said increase, only $255 per share was bid therefor. At the time of both of these increases in capital stock, the one hundred shares of stock pledged still stood on the books of the company in the name of Sarah L. Peck, and she subscribed, and paid for at par, the ninety-nine shares of capital stock which are here in dispute, and received certificates therefor. She also received from the company, during the period which intervened between the first pledge of the one hundred shares of stock, in 1880, and the execution of the note of May 14, 1883, quarterly dividends upon said one hundred shares, and after said last mentioned date received one dividend thereon, said last mentioned dividend amounting to about $250.

Messrs. DEXTER, HERRICK & ALLEN, for the appellant:

It is the intention with which the new note or bill is given and accepted. It is a question of fact whether a new note is given in discharge of a former one. *Hart* v. *Bollar,* 15 S. & R. 162; *Yates* v. *Valentine,* 71 Ill. 644; *Morrison* v. *Smith,* 81 id. 221; *Hough* v. *Insurance Co.* 57 id. 318; *Strong* v. *King,* 35 id. 19; *Flower* v. *Elwood,* 66 id. 446; *Conway* v. *Case,* 22 id. 127; *Archibald* v. *Argall,* 53 id. 307; 2 Greenleaf on Evidence, sec. 54; 2 Daniel on Neg. Inst. 292.

But outside of the question of payment, the new contract of pledge merged all prior contracts of pledge. It defined the security pledged, the purpose for which it was held, and the indebtedness secured. Parol evidence is not admissible to change or contradict its terms. Jones on Pledges, sec. 157.

Messrs. WILSON & MOORE, for the appellee :

The renewal of notes from time to time was not a waiver of claim for either stock or cash dividends.    The title to such dividends is in the pledgee, and when they are collected by the pledgor, the pledgee may sue and recover the same when he has received certificates of stock.    Colebrook on Collateral Securities, secs. 280, 468 ; *Merchants' Nat. Bank* v. *Richards,* 6 Mo. App. 454 ; 74 Mo. 77 ; *Gaty* v. *Holliday*, 8 Mo. App. 168 ; *McNeill* v. *Bank*, 46 N. Y. 331 ; *Leitch* v. *Welles*, 48 id. 601.

The same rule applies to the increased stock issued.    *Gray* v. *Portland Bank*, 3 Mass. 365 ; *Eidman* v. *Bowman*, 58 Ill. 444 ; *Atkins* v. *Albree*, 12 Allen, 360.

The renewal of the notes to the bank was not payment, and did not, therefore, discharge the security.    *Flower* v. *Elwood*, 66 Ill. 446 ; *Darst* v. *Bates*, 51 id. 444 ; *Rogers* v. *Trustees*, 46 id. 428 ; *Worcester Nat. Bank* v. *Cheeny*, 87 id. 614 ; *Citizens' Nat. Bank* v. *Dayton*, 116 id. 263 ; *Campbell* v. *Trotter*, 100 id. 281 ; Edwards on Bailments, sec. 318.


Mr. JUSTICE BAKER delivered the opinion of the Court :

The mere change of the form of an indebtedness does not release the security given therefor, unless such was the intention of the parties.    A renewal of the note, its reduction to a judgment, or other change not intended to operate as a discharge of the lien, still leaves it, as between the parties, in full vigor.    (*Rogers* v. *School Trustees*, 46 Ill. 428 ; *Flower* v. *Elwood*, 66 id. 438.)    In the latter case this court said : "Whether this exchange of notes operated to discharge the mortgage, as between the parties, at least, depended upon their intention."

In *Jarnagan* v. *Gaines*, 84 Ill. 203, Jarnagan had a note secured by mortgage, and after the institution by him of proceedings in bankruptcy against the maker, he entered into an agreement with the other creditors of the maker to dismiss the

proceedings in bankruptcy and take a new note, payable in two years from date, without interest, and it was held, in the absence of proof of any distinct intention that the mortgage should be released, that the taking of such new note, under the circumstances, would operate as a release of the mortgage.

In *Tucker* v. *Conwell*, 67 Ill. 552, Conwell had sold to Croskery a quarter-section of land, and Croskery, to secure the purchase money, executed notes and a mortgage on the land. Croskery sold the land to one Berry; also gave to him his notes and a mortgage, and he transferred them to Conwell. In May, 1857, Berry sold the west half of the quarter-section to one Shubert, and Conwell received Shubert's notes for one-half of the amount of Berry's notes, and released said west half from all prior incumbrances. Shubert, in February, 1859, sold said west half to one Morris, and he mortgaged it to Conwell and one Walker, to secure the payment of his promissory notes given for the purchase money. In August, 1857, Berry sold the east half of the quarter-section to one Adkins, who gave Berry a mortgage on the land to secure the purchase money. In August, 1858, Adkins sold to Morris, who mortgaged the whole quarter-section to Parker, Russell & Co., and subsequently conveyed to Beaman, and others composing that firm, the east half, and they afterwards foreclosed their mortgage against Morris and others, and Parker, Russell & Co. became the purchasers of the entire quarter-section at a sale made by the master in chancery, and, the land not being redeemed, obtained a deed, and afterwards sold the land to Tucker and others. Walker and Hancock, to whom the Berry notes were assigned, filed a bill and obtained a decree against Berry and Morris, and sold the land, and Conwell became the purchaser, and afterwards obtained a master's deed. In August, 1867, the lands were sold under a judgment in *scire facias* against Croskery on the note last falling due on his purchase, and Conwell became the purchaser at that sale. It was held that the Croskery note and mortgage were fully discharged and

satisfied before the *scire facias* was brought, and this court there said : "Why take new mortgages at each sale if it was not understood those formerly given were then released? If Conwell relied on the Croskery notes and mortgage, we can see no reason for new notes and mortgages. They in nowise increased the security. If the land was worth the debt, its collection could be enforced upon that security as effectually as by taking new mortgages. The Croskery mortgage was a lien on the land prior to all others, and could not be bettered by taking others on the same property."

The reasoning in *Tucker* v. *Conwell* seems to be, at least to some extent, applicable to the transactions involved in the case at bar. The mere renewal of the John L. Peck notes and of the Peck & Bausher notes would not have had the effect of releasing the pledges given for the security of those notes. The shares of stock could as easily and as effectually have been sold under the first pledge which was made of them for the payment of the combined indebtedness, as under any of the subsequent pledges made, or the pledge of May 14, 1883. In fact, such first pledge would much more certainly have afforded a sufficient security and remedy, for under it, beyond any chance for cavil or controversy, the dividends which had been declared and might be declared upon the stock, from the date of the pledge until a sale was made under the power given, would have accrued to the pledgee, and that question would have been eliminated. Then, why take new pledges at the time of the execution of each new note, if it was not understood the pledges formerly given were then released?

Mark the language of the contract made on May 14, 1883 : "Having deposited with said bank, as collateral security, certificates for one hundred shares of the stock of the Chicago City Railway Company. This stock is also held as collateral security for note of Peck & Bausher." This contract was accepted by the bank, and it must be presumed it expressed the then existing intention of the parties. What was it that

was pledged for the John L. Peck indebtedness? One hundred shares of stock, and not said shares and also the twelve dividends which had, during the preceding three years, been declared and paid thereon, and also ninety-nine additional shares of stock that had theretofore been issued by the railway company. If it be granted the bank did not at that time know of these dividends or of these additional shares of stock, yet it is not perceived how that changes the case. When it took this written contract of pledge, it understood it was taking in pledge the one hundred shares, only. The evidence of the vice-president of the bank, who seems to have acted in these various transactions on behalf of the bank, is corroborative of this. In speaking of these one hundred shares, he says: "I know, as a matter of fact, that on February 10, 1883, the stock was quoted so that the stock was worth more than the indebtedness which we held; that is all that I cared to know." It also appears from his testimony in that connection, that he did not pay any attention to the value of the stock from the last mentioned date until after May 14, 1883. By the terms of the contract it was also "this stock"—the one hundred shares—which was then taken in pledge as security for the Peck & Bausher debt.

What else do we find in the written contract that shows the then present intention and understanding of the parties? The power of sale contains this language: "I hereby give the said bank authority to sell the above described securities, or any part thereof, on the maturity of this note," etc. Why "hereby give" a power of sale, if the like authority theretofore given was not understood to be then revoked and released? And the subject of the power so given was stated to be "the above described securities,"—*i. e.*, the one hundred shares of stock, and not shares of stock additional thereto, or any other or different securities. In Jones on Pledges (sec. 157,) it is said: "Parol evidence is not admissible to contradict the contract of pledge, such as a statement in a promissory note that certain

stock had been transferred as collateral security.   *   *   *
The rule that oral evidence can not be admitted to alter a
written contract, is applicable, and must prevail."

The conduct of the bank at the time the note of May 14,
1883, was given, and its conduct antecedent to that date, was
consistent with and corroborative of the view each making of
a new note and new written contract of pledge was understood
and regarded by the parties to be a new pledge and a cancel-
lation of the old pledge.   On each of these occasions the old
contract of security was returned to the maker, and a new con-
tract of pledge and power of sale substituted therefor.   It is a
question of intention, and such surrender and substitution are
indicative of an intention on the part of the bank to waive its
rights under the old and rely upon its rights under the new
contract.   It is manifest from its conduct, and from the whole
course of dealing between the parties, and from the testimony
of the vice-president of the bank, that appellee deemed the
one hundred shares of railway stock as not only ample secur-
ity for the John L. Peck indebtedness, but also as affording
some security, in addition to that held in the shape of lard and
stearine receipts, for the firm indebtedness of Peck & Bausher.
The bank may have had no notice or knowledge the railway
company had issued any additional shares of stock to its stock-
holders during the time the one hundred shares of stock were
in its possession as collateral security, and may have had no
information in respect to the dividends made by the company
during that time and paid to appellant's testate ; but it must
have known, or at least have had good cause for knowing or
supposing, that a street railway company in the city of Chi-
cago, located as the lines of the Chicago City Railway Com-
pany were, and of its capital, financial standing and bulk of
business, must, in the nature of things, have earned and de-
clared dividends of some kind and to some amount during
the almost three years that the one hundred shares of stock
were held as a pledge, and the bank and its officers are pre-

sumed to have known the law, and that if the first contract of
pledge was a continuous and never-released contract of pledge,
as is now contended, said bank, as pledgee of the stock, was
entitled to receive, as a part of its security, the accruing divi-
dends upon such stock so in its possession.   But it did not
attempt to collect such dividends, made no inquiries or demand
in regard thereto, and did not even take the trouble of notify-
ing the railway company of its interest in the stock, by having
it transferred to it on the books of the company, as it might
readily have done, or otherwise.   Such conduct on the part
of a pledgee, of the business knowledge and capacity of appel-
lee, and of ordinary prudence, is only explicable upon the sup-
position the bank and its officials understood the contract for
collateral security existing between it and John L. Peck was
not one and a continuing contract, extending from August,
1880, but that, on the contrary thereof, they understood the
contract of pledge was, from time to time, released, and a
new contract of pledge substituted therefor, by agreement of
parties, and that they were satisfied with the arrangement
thus made, and content to hold the one hundred shares of
stock only as security, and to waive the right to the dividends
which had accrued in the lifetimes of the several surrendered
contracts of pledge.

So, also, the conduct of appellee after the 14th of May,
1883, as well as its conduct at and before that date, was con-
sistent with and corroborative of the theory of separate and
distinct contracts of pledge, accompanied by a release of the
preceding pledge and a waiver of its rights thereunder.

The note and contract, with power of sale, dated May 14,
1883, with the indorsements thereon, is in evidence.   There
is indorsed thereon, under the date of July 12, 1884, the fol-
lowing credit: "Net proceeds from the sale of the within one
hundred shares of stock of Chicago City Railway Co., $24,-
687.40."   The reference here, by the word "within," is to the
note and contract for collateral security and power of sale

found in the instrument of May 14, 1883, showing it was under that contract and power that appellee acted in making sale of the stock. The reference, also, by the words "the within one hundred shares of stock," etc., is to the one hundred shares mentioned in the note, and referred to in the power by the words "the above described securities," and other like expressions, as the "collateral security" which was deposited with appellee, and as the subject of the power which it held and exercised. Still another corroborative circumstance of after-conduct is, that on October 31, 1884, it caused the following indorsement to be made on the note: "Balance due and in judgment, $2855.62. Charged to profit and loss, October 31, 1884,"—and also caused like indorsements to be made on the two Peck & Bausher notes. The uncontradicted evidence is, that Sarah L. Peck, who had collected the dividends upon the stock, and who had subscribed for and received the ninety-nine additional shares of stock, at that time had ample property to respond to any demand made upon her, growing out of said dividends and said additional stock.

If, when the note of May 14, 1883, was executed, and a new pledge of the one hundred shares of stock made, and a new power of sale given, the intention was to release and abrogate the former pledge and prior power of sale, then it would seem it is immaterial whether the new note then given is regarded as a payment of the antecedent indebtedness or not, for, even if we assume the old indebtedness continued, notwithstanding the giving of the new note, the case is one where, by the agreement of parties, a security given for an indebtedness is cancelled, and another security therefor substituted. We do not regard the case of *Campbell* v. *Trotter*, 100 Ill. 281, cited by appellee, as decisive of this, for there the new mortgage was designed by the parties as a continuation of the lien of the first mortgage, while here we find the fact to be, that it was the intention of the parties the old lien should be released and a new lien taken in its place. Here, there were successive

pledges of the same property, and the bank is only entitled to the benefit of the last pledge. As, however, Mrs. Peck, after the last pledge of the one hundred shares of stock, collected from the railway company one dividend that accrued upon said stock, and said dividend belonged to the bank as a part of its security, appellant should be held to account, as executor, for said dividend.

The view we have taken of the case obviates the necessity of considering the question raised by appellant that has especial reference to that portion of the decree of the trial court which ordered him to transfer to appellee, as pledgee, the ninety-nine shares of additional stock.

For the reasons we have stated, the judgment of the Appellate Court and the decree of the circuit court are reversed, and the cause is remanded to the latter court, with directions to enter a decree in conformity with the views herein expressed.

*Judgment reversed.*

MAGRUDER, J.: I think the judgment of the Appellate Court in this case ought to be affirmed.