## City of Chicago, Appellee, v. John P. Agnew et al., Appellants.

### Gen. No. 17,855.

1. MUNICIPAL CORPORATIONS, § 396*—*what is effect of settlement by city council of disputed claim of contractor.* A city council may settle a dispute between a contractor and the Commissioner of Public Works as to the value of work done, and any settlement or compromise of such contractor's claim, if made in good faith, is binding on the city, but such a settlement is not binding on the contractor's surety unless he consents thereto.

2. PRINCIPAL AND SURETY, § 26—*when surety discharged.* Where the situation of a surety is materially changed to his prejudice without his consent by any act of the principal and the creditor, the surety is wholly discharged from liability.

3. PRINCIPAL AND SURETY, § 26*—*when surety is discharged.* Where a contract of a city for a public improvement provided for the issuance of estimates by the Commissioner of Public Works of the value of work done and the payment of a portion of such estimated value, the remaining portion being reserved until completion of the work, and the city council settled a dispute as to the value of work done in such a manner that the contractor received nearly twenty thousand dollars before he had performed his work, *held* that such settlement, which was not consented to by the contractor's surety, was a material alteration of the contract operating to discharge the surety.

Appeal from the Municipal Court of Chicago; the Hon. FREEMAN K. BLAKE, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1911. Reversed. Opinion filed November 3, 1913.

SHERIFF, DENT, DOBYNS & FREEMAN, for appellant.

WILLIAM H. SEXTON, for appellee; CHARLES M. HAFT, of counsel.

MR. JUSTICE FITCH delivered the opinion of the court.

Appellee recovered a judgment in the Municipal

*See Illinois Notes Digest, Vols. XI to XIV, same topic and section number.

Court against appellant for damages for a breach of the conditions of a bond given by John P. Agnew, as principal, and appellant, as surety, to secure the performance by Agnew of his contract with appellee for the construction of what is known as "section N of the Lawrence Avenue Intake tunnel," in the City of Chicago. The suit was brought against both Agnew and appellant, but Agnew pleaded a discharge in bankruptcy, and this appeal only brings up the judgment against the surety company. Its defense to the action was and is that the City, without its consent, made overpayments and advance payments to the contractor and others in violation of the provisions of the contract, whereby it is claimed the surety company was released and discharged from all liability on the bond. The City does not deny that overpayments and advance payments were in fact made to the contractor and to others for his benefit, but claims that under the circumstances shown in this case, the position of the surety was not thereby changed to its prejudice, except perhaps to the extent of such overpayments.

In 1905, Agnew and appellee entered into a contract by the terms of which the former agreed to construct a concrete tunnel under the shoal water of Lake Michigan, from a point at the shore line, connecting with a conduit in Lawrence avenue, to a point approximately 1370 feet east, beyond the line of a proposed breakwater in the lake, in accordance with plans and specifications attached to and forming a part of said contract; all of the work to be done under the immediate direction and superintendence, and to the "entire satisfaction, approval and acceptance" of the Commissioner of Public Works, who was authorized to make such alterations "in the execution of the work" as he might deem proper or necessary, and whose decision upon "all questions arising as to the proper performance of the work" should be final; said work to begin at once and be finished on or before July 31, 1906. Appellee, on its part, agreed to pay $138.33 per lineal

foot for the completed work, and agreed to issue to Agnew during the progress of the work, if the rate of progress was satisfactory to the Commissioner of Public Works, estimates in its usual form, for 85% of the "value of the work done and in place at the time of issuing such estimate," the remaining 15% "being reserved until the final completion and acceptance of said work, at which time 2/3 of said 15% so reserved shall be paid to said contractor and the remaining 1/3 retained for one year as per specifications." The specifications provide that on the sixth day of each month "vouchers for 85% of the estimated value of the work done the previous month" will be issued, the remaining 15% to be reserved until the acceptance of the whole work, when two-thirds of the amount reserved shall be paid to the contractor and the remainder held for one year "to secure repair of streets, sewers, etc." The specifications further provide that the contractor shall "furnish and put in place such shores, braces, sheeting, etc. as may be necessary for the safety of the work or the public;" that the shaft at the shore end shall be inclosed by a sheet piling protection, which is to be "permanent and to remain in place and to be included in the contract price;" that the vertical side walls of the tunnel shall be built first in "box-headings ahead of the arch;" that the contractor shall use the pneumatic process of construction, and install a complete and adequate plant for the use of compressed air; that the contractor shall also install a pumping plant with a capacity of "12,000 gallons per minute against the head," and shall maintain and operate the pumps day and night to discharge the sewage and storm water from the Lawrence avenue conduit into the lake, such maintenance and operation to be without "additional" cost to the City; and that oak "tubbing" shall be used in building the upper arch, the cost of which "in place" shall be included in the contract price.

The first estimate issued under these provisions of the contract was dated July 11, 1906. It estimated the total amount due at that date for work done by the contractor to be $26,424.44, which included the estimated value of two hundred and fifty-six feet of "breakwater protection around shaft," seventy-one feet of conduit "timbered and ready for concrete lining," fifty-four feet of concrete lining in place, seven hundred and fifty feet of "side wall excavation" (valued at $12 a foot), and "nine months pumping sewage." It is evident from this estimate, which covered only about one-eighth of the estimated total cost of the tunnel, that the contractor was in no position to complete his contract before the expiration of the time limited, viz: July 31, 1906. It does not appear, however, that the City made any objection to the rate of progress, and on October 1, 1906, the city council passed an order authorizing the Commissioner of Public Works to modify the contract by extending the time of performance to May 31, 1907. The next day a supplemental agreement to that effect was signed, and on October 16, 1906, Agnew and the appellant surety company executed the bond upon which this suit was brought, for $380,000. The bond recites the making of the contract and the supplemental agreement, and is conditioned for the due performance of the same by Agnew "in accordance with the terms thereof and the plans and specifications therein prescribed."

On October 18, 1906, two more estimates were issued to the contractor, and on October 29, 1906, a fourth estimate was issued. The total amount covered by these four estimates was $50,487.44, of which 85% was paid to Agnew and the remainder reserved. In all these estimates the "box headings" were valued at $12 a lineal foot. These box headings were timbered excavations intended to receive the concrete which formed the side walls of the tunnel. Agnew complained to the Commissioner of Public Works that the

amount included in the estimates as the value of these box headings was too small, and requested an additional estimate. Thereupon the Commissioner requested the city engineer to make a special personal examination and valuation of the box headings. The engineer did so and reported that in his opinion the value did not exceed $12 a foot. Agnew persisted, however, in his claim and his request for a higher valuation, and upon this point, he testified as follows: "I told him (the Commissioner) I didn't think I was getting enough money for those box headings and I wanted considerably more; that the amount I was getting was losing me money, and I told him I had to have at least $20 a foot for them. He said he could not award me $20 a foot himself, but that if I could have the City Council order him to so do, he would be very glad to pay me $20 a foot." Acting upon this suggestion, Agnew succeeded in having an order passed by the city council on November 12, 1906, by the terms of which the Commissioner of Public Works was "authorized and directed * * * to estimate the cost of constructing the box headings at the rate of twenty dollars per lineal foot," provided Agnew should first convey to the City all his right, title and interest in the plant used by him in the construction of the tunnel, "said plant to become the property of said Agnew whenever said tunnel is fully completed," and provided further, that a bond in the sum of $40,000 be executed by Joseph Hanreddy as principal and sureties to be approved by the Commissioner conditioned for the completion of the contract by Hanreddy in case Agnew should fail to do so. The conveyance and bond were executed and delivered, and thereupon a new estimate (the fifth) was issued in which 2,506 lineal feet of box heading was valued at $20 a foot, increasing the previous estimates of the value of that part of the work by $19,664, and that additional amount, less 15% reserved, was paid to Agnew as an amount due him under the terms of his contract. The payment of this

estimate made the total amount paid to Agnew $60,924.97, and made the total amount reserved $10,751.47. The city engineer and two of his assistants who were in charge of the work testified that the value of the box headings did not exceed $12 a foot, but Agnew testified that it cost him approximately $17 a foot to construct them. Soon after receiving the amount of the fifth estimate, Agnew stopped work and in March, 1907, the Commissioner of Public Works notified him that his contract was annulled, and notified appellant to complete the work if it desired to do so, otherwise the City would readvertise and relet the contract. Appellant replied that it did not desire or intend to complete the work, because its liability on the bond had terminated. The City then relet the contract to other parties who completed the tunnel at a total cost of $237,134.50. Meantime, the City paid out all of the reserved fund above mentioned for pumping sewage, and for labor and materials furnished, during the interval between Agnew's abandonment of the work and the reletting of the contract. After the tunnel was completed, the City brought this suit to recover the difference between the whole amount paid out for the work, and the original contract price. The case was tried before the court without a jury, and after deducting from the City's demand the additional amount paid for box headings, and $10,800 paid to the second contractors as a bonus, the court entered judgment for the remainder, $71,545.41.

In *Finney v. Condon*, 86 Ill. 78, a contract for the erection of a building provided that partial payments should be made to the contractor as the work progressed to the extent of 85% of the value of work done, upon estimates to be made by the superintending architect, whose opinion and decision "on all matters" should be final and conclusive. The defendant guaranteed in writing the performance of the contract. The owner made various payments to the contractor,

upon estimates issued by the architect, exceeding 85% of the contract price. The contractor failed to complete the work, and the owner sued the guarantors. They contended they were discharged from liability because of such overpayments by the owner without their consent. The court held that under the facts of that case, the estimates of the architect made in good faith were equally binding on the owner and the guarantors, and that for this reason the usual rule under which a surety is discharged if, without his consent, the contract he has guaranteed be materially changed, did not apply. The general rule in that respect was there stated as follows (p. 81):

"The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract, as for him for whom it is to be performed. And there is great justness in the rule adopted. Equitably, therefore, the sureties in such cases are entitled to have the sum agreed upon held as a fund out of which they may be indemnified, and if the principal releases it without their consent it discharges them from their undertaking. The principle is, the withdrawal of the fund agreed upon as security for the performance of the contract without his consent is a prejudice to the surety or guarantor. Sureties and guarantors are not to be made liable beyond the express terms of their engagements. They have the right to prescribe the terms and conditions on which they will assume responsibility, and neither of the principals can change those terms without the consent of the sureties, even with a view to avoid ultimate liability."

In this case, the contract does not give to the Commissioner of Public Works the same power of final decision as to "all matters," that the contract in the *Finney* case, *supra*, gave to the architect. The Commissioner's power in that respect is limited to "questions arising as to the proper performance of the work

and the rate of progress thereon.'' Conceding, however, that this provision and the several provisions of the contract regarding the issuance of estimates are broad enough, when construed together, to give him the right to conclusively determine what amounts shall be estimated as the value of work done, we think the contract clearly contemplates that in the exercise of that power, the Commissioner must act upon his own judgment of values, based upon facts within his own knowledge and experience or within the knowledge and experience of his department engineers, who were in immediate charge of the work. It appears from the evidence that the first four estimates were in fact made in that manner, but that the fifth was not. It was made solely upon the order of the city council, after the Commissioner had declined to assume the responsibility of increasing his previous estimates of the value of box headings to $20 a foot. By that order, the city council assumed the right to substitute its judgment as to the value of the box headings for that of the Commissioner. There is nothing in the contract which authorized the city council to make estimates of the value of work done, or to command the Commissioner of Public Works to suspend his own judgment and accept the value given him by the council. It is true that as between the City and Agnew, the city council had the undoubted right to settle a dispute between Agnew and the Commissioner as to the value of the work done, and any settlement or compromise of Agnew's disputed and doubtful claim, if made in good faith, was binding upon the City. *City of Chicago v. Pittsburg, C., C. & St. L. Ry. Co.*, 244 Ill. 220, 230. But a surety is not bound by such a settlement, unless he also consents. There is no evidence tending to prove that appellant ever assented to the agreement which was made between Agnew and the city council. The estimate thus made has not, therefore, the same conclusive character as the estimates which were under consideration in the *Finney* case, *supra*. There the architect and the

owner both testified that when the estimates in that case were issued and paid, they were thought to correctly represent the fair value of the work done. Here the most that can be said is that the fifth estimate represents the value of the work as agreed on by Agnew and the city council in settlement of a disputed and doubtful claim. In the *Finney* case, the contractor was entitled to his estimates by the terms of his contract. Here Agnew was not entitled to the additional estimate, unless in the judgment of the Commissioner, the value previously estimated for the box headings was erroneous. The evidence clearly shows that such was not the fact. Hence it follows that Agnew received nearly $20,000 in advance and before he had performed his part of the contract. The incentive to perform was thereby removed. The surety was thereby deprived of the most effective means, possibly the only means left to it, of inducing the contractor to continue at work, viz: the hope of reward or of profit. We are clearly of the opinion that by this act of the City and the contractor, the contract between them was materially altered to the prejudice of appellant.

The question then arises: What effect does this conclusion have upon the liability of appellant in this case? We are of the opinion that the great weight of authority supports the proposition that where the situation of the surety has been materially changed to his prejudice by any act or conduct of the principal debtor and the creditor, the surety is wholly discharged from liability. In *Calvert v. London Dock Co.*, 2 Keen 639, which is cited with approval by the Supreme Court of this State in the case of *Finney v. Condon, supra,* the Dock Company made a contract with one Streather, a builder, to perform certain work which was to be paid for as the work progressed, upon estimates of the company's engineer, to the extent of three-fourths of the cost of the work, and the remainder after the work was fully completed. A bond was given to secure the performance of the contract by Streather. Streather be-

gan work and during its progress was paid on the engineer's estimates to an amount considerably in excess of three-fourths of the contract price. Then he became bankrupt and the company finished the work, and sued the sureties upon Streather's bond. Thereupon the sureties filed their bill in equity, claiming that the company had violated its contract and released the sureties by advancing to Streather more than it was bound to do by the terms of the contract. Lord Langdale, Master of the Rolls, in deciding the case in favor of the complainants, said, page 645: "What the company did was perhaps calculated to make it easier for Streather to complete the work, if he acted with prudence and good faith; but it also took away that particular sort of pressure, which by the contract, was intended to be applied to him. And the company, instead of keeping themselves in the situation of debtors, having in their hands one-fourth of the value of the work done, became creditors to a large amount, without any security; and under the circumstances, I think that their situation with respect to Streather, was so far altered that the sureties must be considered to be discharged from their suretyship." That case has been followed and the same conclusion reached on similar facts in many later cases. *Prairie State Nat. Bank v. United States,* 164 U. S. 227 (citing the case of *Finney v. Condon, supra,* and other cases); *Bragg v. Shain,* 49 Cal. 131; *Glenn County v. Jones,* 146 Cal. 518; *Village of Chester v. Leonard,* 68 Conn. 495; *First Nat. Bank v. Fidelity & Deposit Co.,* 145 Ala. 335; *Wehrung v. Denham,* 42 Or. 386; *Fidelity & Deposit Co. v. Agnew,* 82 C. C. A. 103, 152 Fed. 955; *Board of Com'rs Morgan Co. v. Branham,* 57 Fed. 179; *Evans v. Graden,* 125 Mo. 72; *Bell v. Paul,* 35 Neb. 240.

In *Glenn County v. Jones, supra,* Jones entered into a contract with the County to construct a high school building for a certain sum, payable in three instalments; the first, when all the material for the building shall have been delivered on the building site; the sec-

ond, when the roof was on, and the balance on the completion of the building. Jones gave a bond to secure the performance of the contract. After he had delivered the rough lumber and a portion of the materials on the building site he applied to the County Board of Supervisors and was paid the first of the three payments, whereupon he abandoned the contract and left the materials upon the ground unpaid for. The County brought suit on the bond, and in deciding that the sureties were released from all liability, the Court said: ''In our opinion the obligation of the principal was altered in a material respect without the consent of the sureties. The contractor was under the obligation of placing all the materials on the building site before he was entitled to any money under the terms of his contract. By the payment to him before he had done so, he secured the money before performing his obligation. The pressure which would have been exerted upon him to continue in the performance of his contract and place all the materials on the site, was removed when he received the money. He received it before he was entitled to it, without the consent of the sureties. The sureties had bound themselves upon the assumption that the plaintiff would keep its contract in good faith. We can see no difference in principle if the whole of the contract price had been paid before any of the materials were placed on the ground. In such case could any one doubt that the sureties would have been exonerated? The risks of guarantying the construction of a building to be paid for when completed and accepted, is quite different from the risk of guarantying its construction, if the whole contract price should be paid in advance. In the one case the contractor can only get the money by performing his contract, while in the other he would only pay out the money already received, in performing it. * * * By the payment, the hope of reward for further performance was lost, the temptation to act dishonestly was increased.''

The trial court seemed to take the view that although the principle of the foregoing cases had been recognized in *Finney v. Condon, supra,* yet the principle has been ignored in later cases. No case, however, has been cited which supports this view, nor do we know of any such case. All the cases cited, in which the court has declined to apply the rule, are readily distinguishable on the facts, from cases like those of *Calvert v. London Dock Co., supra,* and *Glenn County v. Jones, supra.*

Counsel for appellee have cited many cases in which the rule is stated that if an obligee, without the consent of the surety, parts with securities which have been placed in his hands by the principal debtor, the surety is thereby released only to the extent of the value of the securities thus released. In most of such cases, however, the placing of such securities in the hands of the obligee was a collateral undertaking, and we do not think the principle announced in such cases is applicable to the facts in this case. In the case of collateral undertakings, the principle involved is that of subrogation, the surety being entitled to the benefit of securities deposited by the principal debtor. In the present case, the principle involved is that of a material change in, or departure from, the terms of the contract itself by the principals without the consent of the surety. This distinction is clearly pointed out in *Rogers v. School Trustees,* 46 Ill. 428, at p. 433.

For the reasons indicated, the judgment of the Municipal Court will be reversed and the case remanded.

*Reversed and remanded.*