# W. L. Horn *v.* R. W. Nicholas *et al.*

## (*Nashville.* December Term, 1917.)

1. **REPLEVIN. Right to remedy. Note. Possession.**

Where defendant's agent sold a third person a farm, taking notes, and the agent forged defendant's signature as indorser, pledging the notes as collateral to the bank, and then made new forged notes, exact duplicates of the true notes, which defendant indorsed believing that he had indorsed the genuine notes, the indorsee could not have replevin to recover the true notes; the delivery of the false notes not having been a valid transference vesting legal title in the indorsee in view of Negotiable Instruments Act (Laws 1899, chapter 94) section 16, making a contract concerning a negotiable instrument incomplete until delivery. (*Post, p.* 459.)

Case cited and approved: Gregory v. Ross, 68 Tenn., 599.

2. **REPLEVIN. Right to writ. Note. Possession.**

Assuming that the indorsee of a false note which both parties thought was the valid note was an equitable assignee, he could not maintain replevin to recover the true note, since one to maintain replevin must show a legal right of possession or ownership as distinguished from such a right recognized in courts of equity. (*Post, p.* 459.)

Cases cited and approved: Rice v. Crow, 53 Tenn., 28; Richmond, etc., Foundry Co. v. Carter, 133 Tenn., 489.

3. **REPLEVIN. Right to writ. Note. Possession. "Delivery."**

Where defendant's agent sold a third person a farm, taking notes, and the agent forged defendant's signature as indorser, pledging the notes as collateral to the bank, and then made new forged notes, exact duplicates of the true notes, which defendant indorsed believing that he had indorsed the genuine notes, the indorsee could not have replevin to recover the true notes on

the theory of constructive delivery, since "delivery" means transfer of possession from one person to another, and there could be no transfer of possession where the transferor had no possession. (*Post, pp.* 459, 460.)

4. **ASSIGNMENTS.** Equitable assignment. Discretion of chancellor.

An equitable assignment will be enforced or not in the sound discretion of the chancellor according to justice, but not so as to defeat intervening rights of third persons. (*Post, pp.* 460, 461.)

Case cited and approved: Trabue v. Bankhead, 2 Tenn Ch. 412.)

5. **ESTOPPEL.** Purchaser of note. Effect.

Where the maker of a note took over his own note on which the payee's indorsement was forged, his acts were a mere purchase and he could reissue the note and set up estoppel against one claiming as the payee's assignee on a duplicate note which was forged, except as to the payee's indorsement, when the payee had in writing acknowledged the validity of his indorsement of the note bought by the maker. (*Post, pp.* 461, 465.)

Case cited and distinguished: Morley v. Culverwell, 7 M. & W., 174.

6. **ESTOPPEL.** Rights of assignees.

When estoppel has once arisen in favor of a party, it inures to the benefit of one thereafter purchasing or taking as security from him. (*Post, p.* 465.)

Case cited and approved: Holzbog v. Bakrow, 50 L. R. A. (N. S.), 1028.

---

### FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County.—JNO. ALLISON, Chancellor.

A. W. AKERS, L. J. RUST and F. M. BASS, for Nicholas, et al.

KNIGHT & BEASLEY, for Horn.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

This is one of numerous suits that have arisen by reason of a series of gross frauds perpetrated by one Everett Philpot, who formerly engaged in the business of a real estate agent in the city of Nashville. The bill of complaint in this cause was filed by Horn against R. W. Nicholas, Everett Philpot, W. B. Holcomb, and the Cumberland Valley National Bank to recover, by writ of replevin, from the last-named defendant, the possession of a note for $2,000, executed by Holcomb to Nicholas, on October 12, 1912, due three years from that date; and, in the alternative, to have that note subjected to the payment of complainant's claim against Nicholas by reason of a claimed assignment thereof to complainant by Nicholas; an impoundment of the note in the hands of the Cumberland Valley Bank also being sought. The history of this note is as follows:

In October, 1912, Philpot, as agent for Nicholas, sold a farm to Holcomb, the latter executing to Nicholas three negotiable notes for $2,000 each (the one involved here being of the series) due one, two, and three years, respectively, from date, and secured by an express vendor's lien on the realty sold. Philpot was handed the three notes by Nicholas for safe-keeping in a safe in the office of the former.

Philpot borrowed of the Hermitage National Bank $5,000, and took the three notes from the safe, forged

the signature of Nicholas as indorser thereon, and pledged the same as collateral to the last-named bank to secure his own note of $5,000, due in four months from March —, 1913. Philpot's note was renewed several .times. Some time prior to June 6, 1914, Holcomb paid to Philpot a sum sufficient to discharge one of the notes, and Philpot. paid $1,000 on his own note to the Hermitage Bank; whereupon Philpot renewed his note to the bank in the sum of $4,000, with the three $2,000 notes yet attached as collateral security.

Nicholas, unmindful of the forgery and of the wrongful use Philpot had made of his notes, sought to make use of them in a transaction of his own. Philpot advanced to his client, Nicholas, $1,717 on the first note of the series, but told him that to further the transaction referred to it would be necessary for him to indorse all of the notes to Philpot. The latter presented to Nicholas three instruments which purportedly were those signed by Holcomb. In fact, Philpot this time had cleverly forged the name of Holcomb. as maker to three fictitious notes, exact duplicates of the true notes; and these were indorsed by Nicholas under the belief that he was indorsing the genuine notes of Holcomb to himself. There were then two series: The three genuine notes, with the name of the payee Nicholas forged as indorser, in the possession of the Hermitage Bank; and the three forged notes bearing the genuine signature of Nicholas as indorser. One of the last named Philpot negotiated

(November 13, 1913) to complainant Horn, who took the same believing, as did Nicholas, that it was one of the true notes executed by Holcomb for the realty.

Rumors of other frauds of Philpot becoming current in the city, the officers of the Hermitage Bank called Nicholas into the banking house, showed him the true Holcomb notes with his name on the back, and asked whether those signatures were his own. Nicholas pronounced the signatures to be his, and at the request of the bank officers executed a written statement (June 9, 1914) to this effect:

"I have been shown three notes (describing them) by the officials of the Hermitage National Bank. I recognize my indorsement on them as genuine."

Holcomb, the maker, was also called in to pass upon the genuineness of his signature, which he did.

Holcomb did his banking business at the Cumberland Valley Bank and desired to have his notes carried by that bank. He applied to that bank for money with which to take the notes over from the Hermitage Bank. A loan of $4,000 was granted him with the understanding that the two last maturing notes would be brought from the Hermitage Bank and pledged as collateral to Holcomb's note to Cumberland Valley Bank. Holcomb using said funds to acquire them, the Hermitage Bank, with the consent of Philpot, turned the notes over to Holcomb, and two of them were duly pledged as collateral as had been prearranged. It is the last maturing one of said notes that complainant seeks to reach—the counterpart of

the false instrument Nicholas had indorsed to him.

It appears that, at the time Holcomb took the notes from the Hermitage Bank, he had knowledge of the contents of the above-written declaration of Nicholas touching the validity of his indorsement; and held been told by the bank's president that Nicholas had carefully examined the signatures on the backs of the notes. Later on, meeting Nicholas on the streets of the city, Holcomb had referred to the incident of thus vouching to the bank as to the maker's signatures, when Nicholas stated to Holcomb that his own signatures on these notes were also genuine.

It does not appear, however, that Holcomb informed the Cumberland Valley Bank of Nicholas' personal assurance to him, or that Nicholas made any direct representations to that bank respecting the notes. That bank relied upon Holcomb's assuring himself that the notes were genuine in every respect; and the president of the bank says he relied for the validity of the notes in every respect upon the statements made to him by Holcomb, after an examination by the latter. So far as he can recall, the written declaration of Nicholas as to his indorsement was never shown that bank.

It is therefore argued in behalf of complainant Horn that the Cumberland Valley Bank cannot claim that Nicholas is estopped, or that complainant as his privy, is estopped, since the bank was not misled to its hurt in taking the notes as collateral in reliance on anything said to it or done by Nicholas.

Failing such an estoppel, it is further contended that the defendant bank cannot hold the note sued for under the forged indorsement of Nicholas, and that complainant as transferee of Nicholas is thereby entitled to the relief it seeks.

How far are these insistences of complainant sustainable?

Nicholas is a defendant and has filed no cross-bill seeking affirmative relief.

We have little difficulty in determining that complainant is not entitled to the remedy of replevin to get possession of the note held by the Cumberland Valley Bank.

No delivery of any real note for $2,000 was made to Horn, and short of that there was no transference of the true $2,000 note which could vest legal title in him. Since the passage of the Negotiable Instruments Act, every contract on a negotiable instrument is incomplete until delivery of the instrument for the purpose of giving effect thereto. Section 16; also, 3 R. C. L., 967.

*Gregory* v. *Ross,* 9 Baxt. (68 Tenn.), 599, is relied upon by complainant as sustaining his contrary insistence; but the rule in that case, if ever sound, has been abrogated by the term of the uniform act.

We need not decide whether the facts gave rise to an equitable assignment of the true $2,000 note to complainant Horn, in this aspect of the case. If it be conceived or conceded that the indorsement by Nicholas to Horn on the forged note amounted to an

equitable assignment of one of the real notes, of equal amount and same maturity, to complainant Horn by Nicholas, we think it clear that such an equitable assignee cannot maintain replevin as is here sought. Complainant to that end must show right of possession or ownership by a title recognized at law, as distinguished from one, which is recognized only in courts of equity. *Rice* v. *Crow,* 6 Heisk. (53 Tenn.), 28; *Richmond etc., Foundry* v. *Carter,* 133 Tenn., 489, 182 S. W., 240, and cases cited.

But another phase of complainant's bill presents more difficulty. He seeks, as stated, to set up an equitable right to the real note in the possession of the Cumberland Valley Bank, and to demonstrate that the bank has no legal claim to the paper as against Nicholas, because of the forgery of the signature of Nicholas; and therefore that the bank has no defense as against complainant treated as Nicholas' equitable assignee.

We need not decide, in this aspect of the litigation, whether since the enactment of the Negotiable Instruments Law there can be such an equitable assignment of a note, without a delivery actual or constructive, or whether the fact of indorsing the forged note with intention to negotiate and deliver a real one would constitute an equitable assignment of the valid instrument.

But Horn contends that there was a constructive delivery to him by Nicholas. Constructive delivery is recognized in one of the general provisions of the

Negotiable Instruments Law thus: " 'Delivery' means transfer of possession, actual or constructive, from one person to another." We are unable to comprehend how Nicholas could make a constructive delivery of an instrument that was not in his own possession or control. The true note of Nicholas was in the possession of another, the bank, at the time he purported to transfer it to Horn; and we hold the contention that there was a constructive delivery to be unsound.

If such an equitable assignment be assumed, for purposes of test and disposition of the cause, complainant confronts a difficulty in the doctrine recognized in this State to the effect that the affording of that form of relief is in order to the attainment of just results, and that an equitable assignment will be enforced or not in the sound discretion of the chancellor, according to the circumstances of the case, but not so as to defeat the rights of third persons which have intervened. *Trabue* v. *Bankhead*, 2 Tenn. Ch., 412; 2 Pom. Eq. Juris. (3 Ed.), section 714.

Did Holcomb in taking over the notes from the Hermitage Bank have a *status* that admits of his asserting an estoppel as against complainant?

Where the maker before its maturity acquires his own note, the common-law authorities were divided as to his right to be treated as a holder for the purpose of reissuance. Some of the cases held that payment in such case extinguished the instrument, so that the maker's subsequent transferee could not hold the other parties to the instrument liable. The doc-

trine of the other line of authorities is thus stated and approved in 8 C. J., 592, where the cases *pro* and *contra* are collected:

"According to the better authority, such a payment operates as a mere purchase, and the payer may reissue the note before maturity, and his transferee may recover thereon against all parties to the instrument as a *bona-fide* holder for value."

The reasoning in support of the latter rule may be thus summarized: The intention of the maker to pay his paper before maturity is the more improbable. His undertaking is to pay at maturity, not before; "payment means payment in due course and not by anticipation;" before maturity he, as well as a third person, may discount the instrument, and the fact that the paper is in the maker's possession should not import notice that it has been extinguished. Its negotiability which originally was for the full period up to maturity date is not cut short or destroyed by reason of the fact that it has come into the maker's possession before maturity.

In *Morley* v. *Culverwell*, 7 M. & W., 174, 151 Eng. Reprint, 727, Lord ABINGER, C. B., said: "A bill is not properly paid and satisfied according to its tenor unless it be paid when it is due; and consequently if it be satisfied before it is due, by an arrangement between the drawer and acceptor, that does not prevent the acceptor from negotiating it."

Mr. Daniel, in the last edition of his Negotiable Instruments (page 914), after quoting the language

of the above decision, states that in the first edition he had stated the law to be in accord with the New York or minority rule, but that "examination of the English authorities, and of the South Carolina case, has satisfied him of the error, and that the English view is correct."

This, we believe, is also the conception of bankers and men of commerce as to the rights of such parties; and it evidently was the one acted upon in the instant case. The doctrine admits of convenient results in practical operation, as the facts of this case manifest. The maker was permitted to keep alive the lien securing the note by being allowed to acquire for reissue; whereas, if the note were to be treated as paid, it would be necessary to create a new lien to secure a fresh note.

The Negotiable Instruments Law, it appears, is framed to accord with this view. By its section 119 (5) it is provided that "a negotiable instrument is discharged when the principal debtor becomes the holder of the instrument at or after maturity in his own right," thus indicating that by acquisition before maturity a discharge, precluding renegotiation does not result. By section 50 it is provided:

"Where an instrument is negotiated back to a prior party, such party may, subject to the provisions of this act, reissue and further negotiate the same. But he is not entitled to enforce payment thereof against any intervening party to whom he is personally liable."

The privilege of acquiring in negotiation and of reissuing is thus broadly in favor of any prior party. And by section 30 an instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof.

It therefore appears that if Holcomb was led, as he claims, to acquire the paper from the Hermitage Bank, as from one which held the note under Nicholas' indorsement and which could pass title in a negotiation back to him, he had *status* to invoke estoppel against complainant, claiming in the right of Nicholas. Holcomb would be in the attitude of parting with his money in taking over the paper on faith that the Hermitage Bank held the instruments under valid indorsements. His was a purchase, and he became a holder, qualified and with limited rights it is true; and in respect thereof he could be misled to his hurt. A second satisfaction of his notes would now threaten Holcomb without fault on his part, otherwise.

We hold that upon the facts stated Nicholas is estopped, and that Horn is affected by the same even if he were treated as having the equitable assignment he claims.

When Nicholas gave the written statement to the Hermitage Bank, he must be taken to have understood fully that it related to instruments that were negotiable in character, and that were so to remain until maturity

dates, long distant; and, further, that it would be re-
lied on by any person in negotiating with the bank
for the notes to whom knowledge of the statement
might come. He equipped the then holder of the notes
with evidence of his own making of the holder's osten-
sible power to transfer. The case is peculiarly one
for the application of the doctrine of estopped *in pais.*

The estoppel having thus once arisen in favor of
Holcomb, it inured to the benefit of one thereafter
purchasing or taking as security the instruments from
him—in this case the *Cumberland Valley Bank.* 10
R. C. L., p. 809; and note to *Holzbog* v. *Bakrow,* 50 L.,
R. A. (N. S.), 1028.

The bill of complaint was properly dismissed as to
defendants Holcomb and the Cumberland Valley Bank.
Affirmed.