Chicago Title and Trust Company, Complainant and
Appellee, v. James A. Bidderman et al., Defendants.
Appeal of Louis K. Boysen et al., Appellants.

Gen. No. 37,128.

458

Opinion filed June 15, 1934.

ROBERT F. KOLB, for appellants.

SABATH, PERLMAN, GOODMAN & REIN, for appellees James A. Bidderman and Kate Bidderman.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

Upon default in the payment of $10,000 principal and the fifth semiannual instalment of interest due January 1, 1932, under a $750,000 bond issue secured by a trust deed on property situated at 4425 Sheridan road, Chicago, Illinois, the trustee filed a bill to foreclose, naming James A. Bidderman and Kate Bidderman, the mortgagors, as defendants. The original trustee, the State Bank of Chicago, having consolidated with the Foreman Trust and Savings Bank under the name of Foreman-State Trust and Savings Bank, the bill was filed in the name of the latter bank. A receiver was appointed for the Foreman-State Trust and Savings Bank, who resigned in its behalf as trustee, and the Chicago Title & Trust Company, as successor trustee, was substituted as complainant. February 14, 1933, an amendment to the bill of complaint was filed alleging that after the delivery to and certification by the State Bank of Chicago of all of the bonds of the issue, bonds numbered 1151 to 1250, both inclusive, for $1,000 each, together with interest coupons evidencing the interest thereon, were turned over and delivered back to James A. Bidderman, and that complainant was not advised of what the intention of the parties was with respect to the legal effect of the delivery of such bonds to James A. Bidderman. Bidderman filed an answer to this amendment alleging "that the bonds

were purchased for resale at par and accrued interest by the defendant, James A. Bidderman, from the State Bank of Chicago, legal holders and owners thereof, with the specific understanding and agreement that same would be kept on a parity with all other outstanding bonds secured by the trust deed sought to be foreclosed herein, and might be negotiated to the public by said defendant, James A. Bidderman, in the same manner as all other bonds secured by said trust deed, and that they are entitled to share pro rata in the proceeds of any sale to be held pursuant to any decree entered in this cause." Thereupon appellants, constituting a "Committee for Bondholders," sought and were granted leave to intervene and become parties defendant to the foreclosure proceedings. Their petition, which was ordered to stand as an answer, alleged that when said bonds and interest coupons were delivered to Bidderman, who paid the State Bank of Chicago $100,000, that "it was his intention by the payment of said money to pay said bonds," and that "said bonds and coupons have been paid and are not entitled to share in the security conveyed by said trust deed."

The master found and the chancellor decreed that the $100,000 bonds in question were acquired by James A. Bidderman, not with the intention of paying and canceling them, but, on the contrary, with the intention of purchasing the bonds as instruments continuing in validity and negotiability. Appellants seek by this appeal to reverse the decree which ordered that the "Bidderman" bonds, numbered 1151 to 1250, be considered on a parity with all of the other bonds in the distribution of the proceeds of the sale of the foreclosed premises.

Inasmuch as all parties to this appeal were defendants below, to avoid confusion the individuals comprising the bondholders' committee have been and will

be referred to as appellants and the Biddermans as appellees.

Although it was stipulated before the master that the title to the property was in joint tenancy in the names of Kate Bidderman and James A. Bidderman, when they signed the application and contract for the loan and executed the bonds and the trust deed securing them Bidderman testified that Kate Bidderman was the beneficial owner of the property and that his only interest in it was his inchoate right of dower. This $750,000 loan was made and the bonds representing same were executed, delivered and certified pursuant to the following application for the loan:

"LOAN APPLICATION.

"Bond issue (Completed Building)  Completed Building
Bond issue (Construction)  ×  Construction
Vacant
"Chicago, March 11, 1929.

"To STATE BANK OF CHICAGO

"We hereby apply to you for a loan of $750,000.00. (Here follows a description of the various maturities of the proposed loan, with interest at 6% per annum . . . .)

"As security for such loan, we will give bonds and trust deed in your usual form, conveying in fee simple, free of incumbrance, the Southeast corner of Sheridan Road and Galt Avenue. . . .

Value Building  $750,000.00 ⎱
Value Ground     300,000.00 ⎰ Total Value $1,050,000.00

(State Bank of Chicago to place $750,000.00 fire insurance and give Bidderman half the line.)

"The trust deed is to be a first, valid lien upon the premises.

"The title to the property is in (or will be in) Kate Bidderman and James A. Bidderman.

"The note or bonds to be dated July 1, 1929, and signed by all . . . .

"We will furnish a complete merchantable Abstract of Title, continued so as to show said trust deed as aforesaid, or at your option will furnish a mortgage guarantee policy for the amount of said loan . . . and will pay you a commission of 4% net on the amount of said loan for your services in negotiating the same, which commission shall be considered as earned upon the signing of this application.

"Within a reasonable time, at your request, we agree to execute and deliver to you the notes and trust deed . . . and if we fail to do so, we nevertheless, agree to pay you all the expenses incurred by you and to pay you said commission for your services hereunder.

"MEMOS: James A. Bidderman agrees to purchase $100,000.00 worth of bonds of this issue, commission to be rebated on the $100,000.00 only so purchased at the rate of 3%. Also completion bonds by the contractors to be furnished to Mr. Bidderman for completion of the building.

"SIGNED: JAMES A. BIDDERMAN
KATE BIDDERMAN."

The first 20 bonds aggregating $10,000 had been paid and canceled prior to the filing of the bill to foreclose, and it was stipulated further between the parties before the master that the intervening petitioners, Louis K. Boysen, Walter L. Cohrs, Homer J. Livingston and John P. Hooker, have deposited with them under the deposit agreement in evidence, bonds secured by the trust deed in the sum of $638,500 par value, and that the only bonds not on deposit with the committee are bonds numbers 24, 25 and 26, totaling $1,500, and bonds numbered 1151 to 1250, both inclusive, aggregating $100,000. (The Bidderman bonds.)

The trust deed executed by James A. Bidderman and Kate Bidderman July 1, 1929, conveyed the prem-

ises described in the decree to the State Bank of Chicago and recited that they were indebted in the sum of $750,000 evidenced by 1,250 bonds all substantially of the following tenor and effect, except as to distinguishing numbers, denominations and date of maturity: (Only pertinent portions are set forth.)

"The undersigned, James A. Bidderman and Kate Bidderman, for value received, promise to pay to bearer or the registered owner hereof, on the first day of January, .............. the sum of $500.00 with interest thereon from date, at 6% per annum, payable semiannually. . . .

"All of the bonds herein described and issued and authenticated, as aforesaid, and the interest coupons attached thereto, shall stand upon an equality as to the security and protection of said trust deed except as therein otherwise provided, without any preference or priority whatsoever of the lien thereof in favor of any one or more of said bonds or coupons over any one or more of the others, and without regard to the date of the actual issuance, authentication, delivery, sale, negotiation or maturity thereof. . . .

"The party of the first part reserves and shall have the right upon written notice to the trustee sixty days prior to the date of redemption and upon the terms and conditions set forth in said indenture (trust deed) to redeem this bond on any date at par and accrued interest thereon, to date of redemption, together with a premium of 2% on the principal amount hereof, provided, however, that all bonds so redeemed shall be paid in the inverse order of their numerical number, 1½% of which shall belong to the legal holders hereof, and ½% to the State Bank of Chicago for its services.

James A. Bidderman.<br>Kate Bidderman."

Then follow the provisions of the trust deed, of which the ensuing are material to this controversy:

"The lien and security of this indenture shall take effect from the day of the date hereof, without regard to the time or times of the payment or disbursements of the principal sum hereby secured or intended to be secured and without regard to the date of the actual issuance, authentication, delivery, sale, negotiation or maturity of said bonds and as though, upon the day of the date hereof, all of said bonds were actually authenticated, sold, negotiated and delivered and in the hands of innocent holders for value."

## "ARTICLE 2.

"Section 1. All bonds issued and authenticated hereunder shall stand upon an equality as to the security and protection of this indenture, except as herein otherwise provided, without regard to the date of actual issuance, authentication, delivery, sale, negotiation or maturity thereof.

"Only such bonds as shall have been authenticated by the certificate of the Trustee as aforesaid shall be entitled to the benefit of this indenture, . . . and no holder of any bond issued hereunder, which shall have been so authenticated, shall be under any duty to ascertain whether the same has been duly issued, authenticated and delivered according to the provisions hereof.

. . . . .

"Each bond hereby secured shall be negotiable and pass by delivery, unless registered for the time being in the name of the owner thereof on the books kept by the STATE BANK OF CHICAGO as provided in said bonds. . . . The bearer of any bond hereby secured, which shall not be registered, as hereinbefore authorized, and the holder of any coupon for interest on any bond, whether such bond be registered or not, shall for all purposes of this indenture, be deemed and regarded as the absolute owner of such bond or coupon, as the

case may be, for the purpose of receiving payment thereof and for all other purposes.''

## ''Article 8.

''Section 1. All, or any of the bonds at any time outstanding hereunder, may, at the option of the party of the first part, (the intention to exercise such option to be evidenced by a writing filed with the Trustee) be redeemed from the holder or holders thereof on any date at par and accrued interest thereon, together with a premium of Two (2) per cent on the principal amount thereof; provided said notice of such intention to redeem, specifying the numbers of the bonds to be redeemed, if less than all, shall have been delivered to the Trustee not less than sixty days prior to the date therein specified when such redemption is to be made. . . . The bonds to be redeemed, if less than all of the outstanding bonds, shall in all cases be the bonds of the most remote maturity, then outstanding, and if less than all of the bonds of any one maturity shall be redeemed, then said bonds shall be redeemed in the reverse order of their numbers. All bonds so redeemed shall be cancelled by the Trustee and delivered to the party of the first part or to the then owner of the equity of redemption in said premises. (Note: The premium of 2% mentioned in Section 1 of Article 8 hereof shall be applied as follows, viz.: $1\frac{1}{2}\%$ thereof to the legal holders of said bonds and $\frac{1}{2}$ of 1% to the State Bank of Chicago for its services in arranging for said redemption.)

''Section 2. If the amount necessary to redeem any bonds called for redemption, . . . shall have been deposited with the trustee, for the account of the holder or holders of such bonds, on or before the date so specified for such redemption. . . . the party of the first part and the Trustee, and each of them, shall be privileged to consider such bonds redeemed from the holder or holders thereof, and the interest on such

bonds shall cease at the date so specified for such redemption and thereafter said bonds shall not be entitled to any rights or benefits hereunder, except to receive payment, as aforesaid, out of the redemption moneys so deposited, anything in said bonds or coupons or in this indenture to the contrary notwithstanding. . . ."

It appeared that pursuant to the agreement in the loan contract the State Bank of Chicago, September 10, 1929, rendered a bill to Bidderman for $100,000, the price of the bonds numbered 1151 to 1250, plus $1,150.70, representing the accrued interest on them from July 10, 1929, and that on the same day Bidderman paid the full amount by his check. Those bonds, with all of their attached interest coupons, were delivered to Bidderman and placed by him for safekeeping with the bank subject to his order.

Appellants contend that the payment by James A. Bidderman, one of the joint makers, to the State Bank of Chicago, the holder and owner of bonds numbered 1151 to 1250, of $101,150.70, the full amount of the principal and interest due thereon, constituted payment and discharge thereof, and that the bonds are no longer the debt or obligation of James A. Bidderman and Kate Bidderman, secured by their trust deed and entitled to share in the proceeds of the foreclosure sale on a parity with the other bonds; that there can be no purchase by a debtor of his own debt; that no matter what name the debtor and creditor endeavor to give to the transaction it amounts in law to a merger or cancellation of the debt; and that when a joint maker of negotiable instruments acquires them or some of them, even prior to maturity, the mere fact of such acquisition operates as an immediate and final cancellation and extinguishment of the instruments, regardless of the intent with which they may be acquired.

Appellee's theory is that the bonds were acquired before maturity by James A. Bidderman by purchase

with the intention of keeping them alive, and that, therefore, the instruments were not thereby discharged; and that they are entitled to share on a parity with the other bonds in the proceeds of the sale.

Under the contract for the loan, and as a condition thereof, Bidderman was required to purchase the $100,000 bonds under consideration. The performance of the contract contemplated the payment of a purchase price of par plus accrued interest, while the price at which the bonds might be redeemed prior to maturity under the terms of the trust deed was par and accrued interest plus a premium of two per cent. The bonds were delivered to Bidderman uncanceled and with the interest coupons attached soon after their issuance and prior to their maturity. Commission was charged and paid upon the full amount of the loan of $750,000. A guaranty policy was required from Bidderman and furnished for $750,000, the full amount of the loan. Insurance was taken out for the protection of the full issue of $750,000 bonds. Interest was paid and coupons evidencing the same clipped, surrendered and canceled upon every bond issued, including the bonds in question. Each bond and the trust deed recited that the issue was composed of 1,250 bonds, aggregating the principal sum of $750,000, all upon an equality and parity. The State Bank of Chicago, the lender and original holder of all the bonds, caused a circular to issue advertising that the bond issue was composed of 1,250 bonds, aggregating $750,000. Complainant's evidence disclosed that at the time of the default and of the filing of the bill to foreclose all of the bonds numbered 1151 to 1250, inclusive, together with the interest coupons thereon, maturing on and after January 1, 1932, were still outstanding.

The provisions of the bonds and trust deed as to redemption or payment declare that to redeem any or all of the bonds of the issue the owners of the equity

must, in addition to giving notice and paying par and accrued interest, pay a premium of two per cent on the principal amount of the bonds redeemed. The evidence conclusively shows that when Bidderman acquired the bonds in question the parties interested neither intended nor effected a redemption of them. It is undisputed that neither was any premium paid nor notice given of any intention to redeem. Redemption under the terms of both the bonds and the trust deed presupposes cancellation at the time of payment. These bonds purchased by Bidderman prior to maturity were never canceled and no other bondholder was damaged by his contract to purchase them, nor did his purchase of the bonds detract one iota from the security the other bondholders were rightfully entitled to. We are aware of no rule of law that precludes the making of a contract whereby one of the makers of the bonds agrees in good faith to purchase some of them when issued and before maturity, when such purchase does not operate to abridge the rights of other bondholders.

The evidence discloses that from the moment Bidderman signed the loan application, including his agreement to purchase $100,000 of the bonds, until the actual purchase of the bonds by him long prior to their maturity, it was the intention of both himself and the State Bank of Chicago, the original holder and owner of the bonds acquired by Bidderman, that he was to purchase that amount of live, negotiable instruments, and that by such purchase he was in no sense paying them off for the purpose of redemption. This being so, and appellants must concede it because there is no evidence in the record to the contrary, we are met with appellants' contention that Bidderman could make no valid purchase of the bonds, even before maturity, since he was obligated on them as a joint maker and that his very act of acquiring them, even though he intended it as a purchase, by operation of law extinguished

them. It does not appear whether Bidderman still is the holder of these bonds or whether he has negotiated some or all of them. We are called upon to determine solely whether a court of equity will recognize the right of the bonds purchased by Bidderman shortly after their issue and before their maturity, in the hands of whomsoever they may be, to share in the security of the trust deed on an equality and parity under the terms of said deed and the bonds themselves or whether they must be held to be extinguished and removed from the protection and security of the trust deed, thereby enhancing the security of the other bonds.

It is of course elementary that if some of the bonds had been actually paid or redeemed the entire security would inure to the balance of the outstanding bonds, but that situation is not presented here. There is not a scintilla of evidence that any bond of the issue except the first 20 was either paid or redeemed.

We are of the opinion that the position of the appellants is untenable and that the authorities clearly support the right of a joint maker or even a single maker of a negotiable instrument to purchase the same before maturity. If such right exists it necessarily follows that the acquisition by purchase does not *ipso facto* result in extinguishment by operation of law.

The Negotiable Instruments Act itself recognizes and pronounces the right of a maker of a negotiable instrument to purchase same and negotiate it in par. 70, ch. 98, Cahill's (1933) Ill. Revised Statutes, which provides:

"Where an instrument is negotiated back to a prior party, such party may, subject to the provisions of this Act, reissue and further negotiate the same, but he is not entitled to enforce payment thereof against any intervening party to whom he was personally liable."

Section 50 of the Tennessee Negotiable Instrument Law, which is identical with par. 70 of our act, was

considered and construed in *Horn v. Nicholas,* 139 Tenn. 453, 201 S. W. 756, where the court, in holding that the acquisition by the maker of a negotiable instrument by purchase before maturity did not extinguish the instrument, enunciated what is now recognized as the correct rule in the following language:

"Where the maker before its maturity acquires his own note, the common-law authorities were divided as to his right to be treated as a holder for the purpose of reissuance. Some of the cases held that payment in such case extinguished the instrument, so that the maker's subsequent transferee could not hold the other parties to the instrument liable. The doctrine of the other line of authorities is thus stated and approved in 8 C. J. 592, where the cases pro and contra are collected:

" 'According to, the better authority, such a payment operates as a mere purchase, and the payer may reissue the note before maturity, and his transferee may recover thereon against all parties to the instrument as a bona fide holder for value.'

"The reasoning in support of the latter rule may be thus summarized: The intention of the maker to pay his paper before maturity is the more improbable. His undertaking is to pay at maturity, not before; 'payment means payment in due course and not by anticipation'; before maturity he, as well as a third person, may discount the instrument, and the fact that the paper is in the maker's possession should not import notice that it has been extinguished. Its negotiability which originally was for the full period up to maturity date is not cut short or destroyed by reason of the fact that it has come into the maker's possession before maturity.

"In *Morley v. Culverwell,* 7 M. & W. 174, 151 Eng. Reprint 727, Lord Abinger, C. B., said:

" 'A bill is not properly paid and satisfied according to its tenor unless it be paid when it is due; and

consequently if it be satisfied before it is due, by an arrangement between the drawer and acceptor, that does not prevent the acceptor from negotiating it.'

"Mr. Daniel, in the last edition of his Negotiable Instruments (page 914), after quoting the language of the above decision, states that in the first edition he had stated the law to be in accord with the New York or minority rule, but that 'examination of the English authorities, and of the South Carolina case, has satisfied him of the error, and that the English view is correct.'

"This, we believe, is also the conception of bankers and men of commerce as to the rights of such parties; and it evidently was the one acted upon in the instant case. The doctrine admits of convenient results in practical operation, as the facts of this case manifest. The maker was permitted to keep alive the lien securing the note by being allowed to acquire for reissue; whereas, if the note were to be treated as paid, it would be necessary to create a new lien to secure a fresh note.

"The Negotiable Instruments Law, it appears, is framed to accord with this view. By its section 119 (5) it is provided that 'a negotiable instrument is discharged when the principal debtor becomes the holder of the instrument at or after maturity in his own right,' thus indicating that by acquisition before maturity a discharge, precluding renegotiation does not result. By section 50 it is provided:

" 'Where an instrument is negotiated back to a prior party, such party may, subject to the provisions of this act, reissue and further negotiate the same. But he is not entitled to enforce payment thereof against any intervening party to whom he is personally liable.'

"The privilege of acquiring in negotiation and of reissuing is thus broadly in favor of any prior party. And by section 30 an instrument is negotiated when it

is transferred from one person to another in such manner as to constitute the transferee the holder thereof.''

Construing the same section of the Negotiable Instruments Act, the Supreme Court of Arkansas in *Harding v. Hagler,* 176 Ark. 146, 58 A. L. R. 175, approving and adhering to the doctrine announced in *Horn v. Nicholas, supra,* held squarely that a negotiable instrument may be reacquired by the maker or one of the joint makers before maturity and reissued so as to carry the lien of the deed of trust or mortgage with it.

In *Kipp v. McChesney,* 66 Ill. 460, a promissory note executed by copartners came back into the hands of one of them and the only question presented for determination in that case, as in the instant case, was, Did the acquisition of the note by one of its joint makers work an extinguishment of it if it was not so intended? At page 461, the court said:

''The only question raised upon the record is as to the effect of the transaction between Dent, the payee and assignor of the note, and Davison, the assignee, the latter being one of the copartners who made the note. It is contended, on the part of the plaintiffs in error, that the transaction was a payment of the note by Davison, one of the makers, or if not a payment, that, as Davison, when he acquired title to the note by assignment, could not have maintained a suit at law upon it against the makers, he being one of them, neither could he have transferred a right to sue upon it to his assignee, the plaintiff, and that the assignment of the note to Davison was, by operation of law, an extinguishment of it.

''We think the case turns entirely upon whether there was a payment of the note by Davison, or a purchase of it by him. If he paid the note as one of the makers of it, it was an extinguishment of the note, and he could not afterwards put it in circulation. The tes-

timony of both Dent and Davison is unequivocal that it was a purchase of the note by the latter, and not a payment. . . .

"Davison testifies that he purchased the note of Dent, and gave him his individual note of $164 for it. Davison seems to have paid for the note with his individual means, and the unqualified indorsement in blank of the note by Dent favors the idea of a purchase. We perceive no satisfactory reason why such a transaction should be adjudged a payment if it were in reality otherwise, or why, by operation of law, it should work an extinguishment of the note if it was not so intended.

"One copartner may deal as an individual with his firm. He may invest his private means in the purchase of partnership securities, as well as any other description of securities, and we do not perceive why he should not be allowed to hold them as valid obligations, without their being accounted as paid or extinguished by his act of purchase of them.

"We think the court below was warranted by the evidence in finding that there was a purchase of the note by Davison, and not a payment of it.

"While the note remained in the hands of Davison, as assignee, he could not have enforced its payment by suit at law, for the reason that he could not have sued himself as maker. . . .

"But this is a difficulty attending the remedy only, not the right. . . ."

It is urged that inasmuch as a copartnership was involved the conclusion reached in the *Kipp* case, *supra,* is inapplicable to the situation presented in this cause, but we see no reason on principle why a different rule should be laid down concerning partners as comakers than as to those who are not partners. The reasoning in the *Kipp* case is sustained by other decisions in this State. (*Walker v. Chicago, M. & N. R. Co.,* 277 Ill. 451; *Rogers v. School Trustees,* 46 Ill. 428; *Flagg v. Geltmacher,* 98 Ill. 293.)

It would seem from the great weight of authority that if a note or bond is purchased or discounted by the maker or joint maker before maturity it is not only not extinguished but it retains its negotiability, and may be again put in circulation. (*Rogers v. Gallagher*, 49 Ill. 182.)

It seems to us that the legal effect of the acquisition of the bonds by Bidderman must be governed entirely by the intention of the parties to the transaction and the surrounding circumstances. We are aware that a debt once paid is extinguished, and that as a mortgage is but an incident of the debt it secures, if the $100,000 bonds purchased by Bidderman were extinguished by the very act of purchase, the mortgage is *functus officio* as to them. But we are convinced that under the weight of better authority, under the meaning of the contract for security expressed in the trust deed that the 1,250 bonds shall remain on a parity until redeemed and canceled in compliance with the terms of the deed, and in accordance with the intention of the parties, the $100,000 bonds purchased by Bidderman were not extinguished but continued to be valid, alive and negotiable. As to the other bondholders we are of the opinion that complete equity will be done them if, in the distribution of the proceeds of the sale of the mortgaged property, they are awarded shares to be ascertained by the proportion which their individual holdings of bonds bear to the whole amount. (*Claflin v. South Carolina R. Co.*, 8 Fed. 118.)

It has heretofore been shown that the State Bank insisted as a prerequisite to its making the $750,000 loan that Bidderman agree to purchase $100,000 of the bonds, and while there is no direct testimony to that effect it is reasonable to infer that Bidderman purchased the bonds with his individual funds. It has also been shown Bidderman testified that Kate Bidderman was the beneficial owner of the property and that his only interest in it was his inchoate right of dower.

To urge that when Bidderman paid $100,000 for the purchase of the bonds before maturity, he by his very act of payment of that amount regardless of his intention to purchase and of the intention of the State Bank to sell, divested himself of his $100,000 and extinguished the bonds he was obligated to and did purchase, is to advance a theory that cannot be afforded the sanction of a court of equity. Such an espousal appears to be just as unconscionable to us as it did to the chancellor.

Permitting the bonds purchased by Bidderman to share in the proceeds of the foreclosure sale on a parity deprives no other bondholder of any right for which he contracted and to which he is entitled by reason of the default and the foreclosure of the trust deed. We are familiar with no principle of equity or good morals that would countenance or sanction mulcting him of his investment or depriving the bonds purchased by him of their security for the benefit of the other bondholders.

No question is involved of Bidderman's right to sue himself at the time he acquired the bonds, or at the present time if he is still the holder of them or any of them, and the interests of all the parties and the right of the bonds themselves to share in the proceeds of the sale have been fairly and equitably determined.

Appellants cite a number of authorities which they insist uphold their position that the purchase of a negotiable instrument by its maker or one of its joint makers before maturity works an extinguishment of the instrument by operation of law. We have carefully examined and considered all of them. Most of them are not in point and the few that appear to be at all applicable are not in accord with the reasoning and conclusion reached by our Supreme Court in the cases heretofore cited and considered, nor with the weight of modern authority generally. As we consider

the decisions of the courts of review of this State conclusive on the question presented for our determination, it would serve no useful purpose to discuss or attempt to distinguish the cases cited.

It is our conclusion that the decree of the circuit court was in accordance with the law, and it is affirmed.

*Affirmed.*

GRIDLEY and SCANLAN, JJ., concur.